**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JEREMIAH DEWAYNE ARNOLD, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-11-1509 |
| | § | |
| CITY OF HOUSTON AND BRIAN HARRIS, | § | |
| | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**

Jeremiah Dewayne Arnold, a federal inmate proceeding *pro se*, filed this section 1983 lawsuit against the City of Houston, Houston police officers Brian Harris and David A. Ryza, and federal agent Glenn Gregory, for alleged violations of his civil rights. Defendants City of Houston and Brian Harris were served and filed a motion for summary judgment (Docket Entry No. 25), to which plaintiff filed a response (Docket Entries No. 32, 35). Also pending before the Court is defendants' motion for contempt and sanctions (Docket Entry No. 41), to which plaintiff responded. (Docket Entry No. 46.)[1]

Following careful consideration of the pleadings, the motions and responses, the record, and the applicable law, the Court GRANTS the motion for summary judgment, DENIES the motion for contempt and sanctions, and DISMISSES this lawsuit for the reasons that follow.

---

[1]Plaintiff's purported second response to the motion for contempt and sanctions (Docket Entry No. 47) was untimely, filed without leave of court, and not made under penalty of perjury. The second response was stricken from the record. (Docket Entry No. 49.)

*Background and Claims*

Plaintiff states that, on August 10, 2009, he was one of three persons arrested and charged with the 1992 murders of four individuals.[2]  He asserts that the charges against him were dismissed a month later when it came to light that he had been in custody at the time of the murders.  During the four weeks that the murder charges were pending, news of the charges appeared in the media, but plaintiff complains that the subsequent dismissal of the charges against him was not publicized.  Plaintiff's co-defendants – Rasheed Aziz and Dewayne Eythell – were also named in the media reports.

Plaintiff claims that defendants falsified the charges against him in a conspiracy to wrongfully arrest and "frame" him for the murders, that they lied under oath and coached witnesses in order to secure the charges, and that they "carried out a media smear campaign to demonize" him.  (Docket Entry No. 1, p. 4.)  In investigating the murders, Harris had interviewed Eric Ward, who stated that plaintiff had bragged to him about committing murders that closely paralleled the facts of the 1992 murders.  Harris also interviewed Dewayne Eythell,[3] who stated that plaintiff had participated in the 1992 murders.  Plaintiff asserts that defendants had no probable cause to charge him for the 1992 murders because public records would have shown that, on June 19, 1992, he was incarcerated under a three

---

[2]One of the slain individuals, Quintin Evans, was the brother of Quanell Evans, who is publicly known as Quanell X.

[3]Harris references Eythell in his reports as "Dwayne."  Prison records reflect Eythell's name as "Dewayne."

years sentence for the unauthorized use of a motor vehicle and was release on January 20, 1993.  The murders, which took place on July 17, 1992, occurred while he was in custody serving this sentence, leading plaintiff to contend that defendants must have coerced Ward to fabricate plaintiff's involvement.[4]

Plaintiff further states that because of the media attention announcing him as one of the murderers of Quanell X's brother, other prison inmates had attempted to physically assault him, resulting in his being housed in administrative segregation for his own safety.

Plaintiff seeks a declaratory judgment, compensatory and punitive damages of twenty million dollars, and injunctive relief ordering defendants to publicly announce his innocence. Defendants move for summary judgment on the basis of qualified immunity, failure to state a viable claim, and lack of probative summary judgment evidence.

### *Standard of Review*

*Summary Judgment*

Although plaintiff is proceeding *pro se*, the notice afforded by the Federal Rules of Civil Procedure is considered sufficient to apprise him as a *pro se* party of his burden in opposing a motion for summary judgment.  *See Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

---

[4]Plaintiff's pleadings do not expressly set forth a claim for malicious prosecution. Assuming they did, it would be subject to dismissal for failure to state a viable claim under section 1983.  *See Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003).

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, (1986); *Triple Tee Golf, Inc. v. Nike, Inc*., 485 F.3d 253, 261 (5th Cir. 2007). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008).

A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary are not considered. *Id.* An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Id.* at 249–50. A court may not make credibility determinations or weigh the evidence in ruling on a motion

4

for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Nor do unsubstantiated assertions, improbable inferences, and unsupported speculation stand as competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). This burden will not be satisfied by "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540. Moreover, Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir. 1992). If the nonmoving party fails to make a showing sufficient to establish the

existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

*Qualified Immunity*

Under the doctrine of qualified immunity, public officials, such as police officers, acting within the scope of their authority are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 418 (5th Cir. 2008).

To determine whether a government official is entitled to qualified immunity for an alleged constitutional violation, courts consider two non-sequential factors. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). One of the two factors asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right. The other factor asks whether, in the light of the specific context of the case, the defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *See Hampton Co. Nat'l Sur., L.L.C. v. Tunica County*, 543 F.3d 221, 225 (5th Cir. 2008). The district court may consider these factors in whatever order it deems appropriate for a particular case. *Pearson*, 555 U.S. at 236.

In the instant case, defendant Harris raises the defense of qualified immunity. The usual summary judgment burden of proof is altered in the case of a qualified immunity

6

defense.  *Gates v. Texas Dep't of Protective and Regulatory Servs*. 537 F.3d 404, 419 (5th Cir. 2008).  Although qualified immunity is called an affirmative defense, the defendant asserting qualified immunity does not have the burden to establish it.  Rather, it is the plaintiff whose burden it is to negate the assertion of qualified immunity, once it is raised. *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009).  An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense. *Michalik v. Harmann,* 422 F.3d 252, 262 (5th Cir. 2005); *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001).  The plaintiff, bearing the burden of negating the defense, cannot rest on conclusory allegations and assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct.  *Id.*

To overcome the presumption of a law enforcement officer's qualified immunity, the actions must be viewed from the perspective of a reasonable law enforcement officer at the time of the events and not in hindsight.  "[A] police officer views the facts through the lens of his police experience and expertise." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Only those facts actually known to the police officer are important to the determination, not facts known only to the plaintiff and not information subject to a variety of interpretations by individuals who are not experts.  *United States v. Banks*, 540 U.S. 31, 39 (2003).

Because defendant Harris has raised qualified immunity in his motion for summary judgment, the burden of negating the defense on summary judgment lies with plaintiff.  *See Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).  In other words, plaintiff must

negate qualified immunity by specifically identifying evidence that rebuts Harris's presumed entitlement to dismissal based upon qualified immunity. *See Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir. 1987).

### *Analysis*

For purposes of section 1983, plaintiff claims that there was no probable cause for his arrest and/or criminal charges because the defendants coerced or "coached" Ward into making untrue inculpatory statements against him; that they conspired to "frame" him for the murders; that they "demonized" him in the media; and that the untrue charges jeopardized his safety in federal prison.  Given a liberal construction, and for purposes of this section 1983 lawsuit, plaintiff's allegations raise a Fourth Amendment claim based on a false affidavit and lack of probable cause, a claim for conspiracy, and an Eighth Amendment claim for failure to protect.

#### *City of Houston*

To establish a prima facie section 1983 claim against a municipality such as the City of Houston, a plaintiff must identify (1) an official policy or custom of which (2) a policymaker can be charged with actual or constructive knowledge and (3) a constitutional violation whose "moving force" is that policy or custom.  *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).  That is, government entities may be directly sued under section 1983 if "the action that is alleged to be unconstitutional implements or executes a

policy statement, ordinance, regulation, or discussion officially adopted and promulgated by that body's officers."  As recognized by the Fifth Circuit Court of Appeals,

> To establish county/municipal liability under section 1983 . . . a plaintiff must demonstrate a policy or custom which caused the constitutional deprivation. A municipality may not be held strictly liable for the acts of its non-policymaking employees under a *respondeat superior* theory.  It cannot be held liable solely because it employs a tortfeasor.  Rather, only when the execution of a county's policies or its customs deprives an individual of constitutional or federal rights does liability under Section 1983 result.

*Colle v. Brazos County*, 981 F.2d 237, 244 (5th Cir. 1993).  The burden is on the plaintiff to prove these three elements.  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

The City of Houston moves for summary judgment on the grounds that plaintiff does not allege, and cannot present any probative summary judgment evidence of, a custom, policy, or practice that was the moving force behind the alleged violations of his civil rights. *See Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658 (1978); *Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir. 1984).  Plaintiff admits in his response to the motion for summary judgment that he "did not allege the defendants had a policy or custom which was known to a policy maker."  (Docket Entry No. 32, p. 1.)  Consequently, no viable section 1983 policy or custom claim has been pleaded against the City of Houston.[5]

_____

[5]Plaintiff's purported summary judgment proof of a "policy or custom of coaching witnesses" encompasses two newspaper articles regarding Harris County and the District Attorneys Office – entities who are not defendants in this lawsuit – and regarding the City of Houston's policy or custom of inadequately training or supervising its crime lab personnel, which is not an issue in this case.  Even assuming plaintiff had pleaded a "policy or custom" claim, these newspaper articles do not constitute probative summary judgment evidence of an official policy or custom by the City of Houston of "coaching witnesses."  Further, plaintiff cannot here claim that he has "eye witnesses that will testify [at trial] to this fact that there exists a custom and

Likewise, plaintiff has not pleaded a claim for failure to train or supervise.[6]

Although plaintiff's claim for prospective (injunctive) relief is not barred by the Eleventh Amendment, *Graham*, 473 U.S. at 167 n. 14, plaintiff is not entitled to the requested injunctive relief, as is discussed later in this opinion.

Because plaintiff raises no viable section 1983 claim against the City of Houston, it is dismissed as a party defendant in this lawsuit.

*Official Capacity Claims*

To the extent plaintiff sues Harris and Ryza in their official capacities, his claims fail. A suit against a government official or employee in his official capacity is actually a suit against the governmental entity that employs him. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996). Thus, plaintiff's official capacity claims against Harris and Ryza are claims against the municipality. *See Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 483 (5th Cir. 2000).

To hold a municipality liable, a plaintiff must demonstrate that a municipal employee acted with subjective deliberate indifference and that the municipal employee's act resulted

---

practice of falsely accusing innocent people of crimes they did not do." (Docket Entry No. 32, p. 4.) The place and time to present probative summary judgment from these alleged witnesses was here within this summary judgment proceeding, which plaintiff failed to do.

[6]Plaintiff re-urges that his newspaper article regarding Harris County and the District Attorney's Office constitutes summary judgment proof that the City of Houston failed to supervise and train its police officers. Again, even assuming plaintiff had pleaded such a claim, the article does not constitute probative summary judgment evidence that the City of Houston failed to supervise and train any police officers involved in plaintiff's case.

10

from a municipal policy or custom adopted or maintained with objective deliberate indifference to the plaintiff's constitutional rights, and that the official government policy or custom was the moving force behind the alleged constitutional deprivation. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999); *see also*, *e.g.*, *James v. Harris County*, 577 F.3d 612, 617–18 (5th Cir. 2009).  This Court has already determined that plaintiff established no such municipal policy or custom for purposes of his claims against the City of Houston; for like reasons, no municipal policy or custom has been established for purposes of the claims against Harris and Ryza.  Plaintiff's official capacity claims are DISMISSED.

*Brian Harris*

Plaintiff also sues defendant Harris in his individual capacity.  He claims that Harris lied under oath in the affidavit to secure the criminal charges, coached Ward to lie about plaintiff's involvement in the murders, and carried out a media smear campaign to demonize plaintiff.  (Docket Entry No. 1, p. 4.)

Plaintiff's assertion that Harris carried out a media smear campaign to demonize him does not raise an issue of constitutional dimension for purposes of section 1983, and no section 1983 claim for which relief may be granted is stated.  At most, these allegations raise state law claims for defamation and related common law causes of action.

Plaintiff further argues that "the only way that the defendants were able to file charges was by coaching their witness Eric Ward."  (Docket Entry No. 32, p. 28.)  For purposes of section 1983, the Court will liberally construe plaintiff's use of the term "coaching" as

11

meaning that Harris coerced or otherwise caused Ward to state falsely that plaintiff was, or that plaintiff stated he was, a participant in the murders; plaintiff contends that this would negate probable cause.  Harris responds that, to the extent any of plaintiff's allegations assert a violation of plaintiff's constitutional rights by Harris in his individual capacity, no constitutional violation took place, and that, even assuming such violation, Harris is entitled to qualified immunity.

It is imperative to note that plaintiff presents no probative summary judgment evidence that Harris coerced or coached Ward to identify plaintiff as a participant in the murders.  Indeed, plaintiff himself admits that Ward "did not disclose to [me] that he was coached by the defendants[.]"  (Docket Entry No. 10, p. 4.)  In lieu of probative summary judgment evidence, plaintiff sets forth his conclusory assertions that Ward could not have known about the murders or any details of the events unless Harris coached him.  Plaintiff asserts his personal belief that, if subpoenaed to trial, Ward would "tell the truth of how he learned such intimate details of the murders[.]"  *Id*.  Plaintiff's conclusory allegations, speculation regarding Harris's actions, and personal beliefs of what Ward might state under oath do not constitute probative summary judgment evidence, and plaintiff fails to raise a genuine issue of material fact sufficient to preclude summary judgment.

In a further attempt to show that Harris coached Ward, plaintiff attaches to his response copies of pages from a transcription of Harris's second police interview of Rasheed Aziz, one of the two other individuals eventually charged with the murders.  The pages

submitted by plaintiff concern Aziz's testimony that one of the murder victims, Laurie Mitchell, had told him she was pregnant, and references a comment by Harris that other people, such as Dewayne Eythell and plaintiff, had also stated that Mitchell was pregnant. (Docket Entry No. 35, p. 14.)  In subsequent pages of the transcription submitted by plaintiff in his response, the following exchanges appear:

> HARRIS:    OK alright I'm gonna ask you just point blank out ok alright cause obviously I haven't charged you ok I want to get the main people ok alright.  Were you involved in any way[?]
>
> AZIZ:    No sir[.]
>
> HARRIS:    Did you think that it was just suppose to be a straight up robbery?
>
> AZIZ:    No sir I didn't even know nothing about this even suppose to be happening.  Now I will say this and I thought about this long and hard when you talked to me about uh the . . . I think you said something about the witness thing or whatever.  You need me to lie I'll lie to get my ass up out this door because I didn't do that you know what I'm saying[.]
>
> HARRIS:    Uh huh[.]
>
> AZIZ:    I don't know what he's talking about but if you feel like that I know something that can implement or get this case closed or whatever then I'm willing to go along with that for you . . . in my own benefit.
>
> HARRIS:    Ok[.]
>
> AZIZ:    But I don't know I didn't do this you see what I'm saying.
>
> HARRIS:    But you . . . now I shared with you some stuff with you about this cat[.]
>
> AZIZ:    Uh huh[.]

HARRIS:     And this cat well this cat and this cat alright um if I was to do that ok if I was to say ok I need you to uh just go along with the story[.]

AZIZ:       Now that's still implementing now the only things that I thought about to on that it would implement me it would make me [. . .]

HARRIS:     I know[.]

AZIZ:       Saying that I know[.]

HARRIS:     So if you had to tell if you had to tell a story of what happened ok in other words if we had to do something like that *I'm not saying I would ok what would the story be?*

AZIZ:       *Whatever you tell me it is.*

HARRIS:     *No, no, no, no* but you see I'm not in that world or whatever so it, what . . .

AZIZ:       I mean I don't know[.]

HARRIS:     What do you think the story is?  What do you think the story would be?

AZIZ:       I don't know man[.]

HARRIS:     I mean kind of set it up for me.

AZIZ:       There is no setup I mean all I know is everybody saying that I killed four people and I didn't.

HARRIS:     Uh huh[.]

                                    *   *   *   *

HARRIS:     I mean did you ever open up the door and let some people in that night?

AZIZ:       Nah uh[.]

HARRIS:     Nothing? You see because that would be real easy to say right?

AZIZ:       Yeah but it would be a lie because [. . .]

14

| HARRIS: | How come? |
|---|---|
| AZIZ: | Because it'll still be saying that I was there and I wasn't[.] |
| HARRIS: | Ok so if you were to make up a story of what happened what would be a good story to make up? |
| AZIZ: | That I wasn't there and I don't know who did it. |
| HARRIS: | How would that help? |
| AZIZ: | I mean I couldn't help but say that I mean I don't know what you want me to say how about that. |
| HARRIS: | Well tell me if a robbery like this was gonna go on, down this murder that these [END OF EXHIBIT] |

(Docket Entry No. 35, pp. 16–19, emphasis added.)

Plaintiff submits these exhibit pages apparently in an effort to show that, because Harris "coached" Aziz, Harris likely "coached" Ward. However, because plaintiff did not attach the complete interview, the Court is unable to consider the significance of these comments or exchanges in context of the entire interview. Moreover, these excerpts do not establish that Harris coerced Aziz to testify as to any certain facts; to the contrary, Harris is shown refusing to provide a "story" or a set of facts for Aziz to follow. In any event, these excerpts provide no probative summary judgment evidence that Harris "coached" Ward to falsely testify as to plaintiff's involvement in the murders.

Moreover, Harris's testimony in the probable cause affidavit signed by Harris and a Harris County district attorney adequately sets out probable cause for plaintiff's arrest and criminal charges regarding the murders:

15

I, Brian Harris, am your affiant. I am a peace officer with the Houston Police Department Homicide Division. I reviewed Houston Police Department (HPD) case number 76911792Z which documented the murder of four individuals on July 17, 1992 at 9416 Coffee #2 in Houston, Harris County, Texas. I also spoke to the original scene detective, Sergeant Jim Binford, of the Houston Police Department.

Binford told me that on July 17, 1992 he was called out to a quadruple homicide at 9416 Coffee #2 in Houston Harris County Texas. Binford said that when he arrived at the location he observed two deceased black males in the living room lying on two separate couches. Binford said that each of the males had a single gunshot wound to the head and it appeared as though they had been shot in their sleep because there were no signs of a struggle. Binford said that he found a deceased female in bed in the bedroom and a deceased male lying on the floor of the bedroom between the bed and an open closet that contained a safe that was open. Binford said that the female had a single gunshot wound to the head and her hand was partially covering her face as if she was trying to shield herself. Binford said that the male on the floor was shot multiple times, with at least one of the shots to the head. Binford located a purse in the bedroom and found a Texas driver's license in the name of Laurie Mitchell and noted that the photograph on the driver's license appeared to be the same person as the deceased female in the bed. Binford said that on July 17, 1992 several family members of the deceased were either at the crime scene when he arrived or showed up while they were still conducting their investigation. Binford said that he spoke to Mary Woods who told him that she was the mother of Robert Keith Arceneaux and she identified his body. Binford said he spoke to Portia Hosea who said that she was the mother of Jonathan Andre Duncan and she identified his body. Binford said that Arceneaux and Duncan were the two deceased males in the living room. Binford said that he spoke to Quanell Evans who told him that he and his brother Quincy, went to their brother's house at 9416 Coffee #2 on July 17 2009 [sic] and found their brother, Quintin Evans, his girlfriend Laurie, and two friends dead. Quanell told Binford that he and Quincy entered Quintin's house through the window because the door was locked with a deadbolt. Binford said that Quanell identified the body of the deceased male on the bedroom floor of 9416 Coffee #2 as Quintin Evans and said that the deceased female in bed was Quintin's girlfriend, Laurie. Quanell told Binford that Quintin went by the nickname 'Toast.'

I obtained copies of the autopsy reports for Robert Keith Arcenaeaux [sic], Jonathan Andre Duncan, Laurie Mitchell, and Quintin Evans from the Harris County Medical Examiner's Office.   I reviewed the autopsy reports and learned that Dr. Eduardo Bellas performed the autopsies on all four bodies on July 19, 1992.   Dr. Bellas documented that the autopsy on Arceneaux's body revealed that [he] had died as a result of a gunshot wound to the head at close range; that the autopsy on Duncan's body revealed that Duncan died as a result of a gun shot wound to the head at close range; that the autopsy of Mitchell's body revealed that [she] died as a result of a gunshot wound to the head (face) at close range; and that the autopsy on Evans' body revealed that [he] died as a result of two gunshot wounds to the head and that the body had two additional gunshot wounds, one to each arm.   The autopsy report for Laurie Mitchell made no mention of her being pregnant.

I received a copy of a letter from Dwayne Eythell written in 2008 in which Eythell wrote that he had information regarding numerous crimes.   I met with Dwayne Eythell [i]n May of 2009 and he told me that he was involved in the quadruple murder of Quintin Evans, Jonathan, Laurie, and another male that took place at Coffee at Wilmington in Houston, Texas in the summer of 1992. I know that 9416 Coffee #2 sits at the intersection of Coffee and Wilmington. Eythell told me that he, Jerry Arnold, and Rasheed Aziz planned to rob Quintin Evans because Quintin was a drug dealer and they believed that Quintin would have a lot of drugs and money in the house.   Eythell said that Jerry Arnold is his cousin and he knew Rasheed Aziz because he used to cut Aziz's hair. Eythell said that up until the murders he believed Aziz was Jamaican because of the way he talked, but that after the murders Aziz started talking without an accent.   Eythell said that Aziz acted as Quintin's bodyguard and assured him that it would be easy to rob Quintin because Quintin trusted him.   Aziz also told Eythell that Quintin owed him money and had disrespected him and that he would get his money one way or another.   Eythell said that Aziz told him that there would be cookies of crack cocaine and a large amount of money at Quintin's house that they could take.   Eythell said that Aziz told him that he would get all of the occupants of Quintin's house high and asleep and then he (Eythell) and Jerry could come in and they could rob Quintin of his drugs and money.   Eythell said that Aziz told him that his (Eythell's) part was to stand guard at the front door of Quintin's house and shoot anyone who came up to the door.   Eythell said that the morning they were going to do the robbery, he and Jerry went to Quintin's house at Coffee and Wilmington and Aziz let them in.   Eythell said that Jerry went into the house first and then waived him in and almost as soon as he got into the house he heard multiple gunshots and saw

17

Jerry and Aziz with guns. Eythell said that from where he was standing in the house he could see one dead male on the couch and heard Aziz yelling 'Kill them all,' and that later Jerry told him that he killed the male and female in the bedroom. Eythell said that Aziz later said that he felt bad about killing the pregnant girl and related a conversation he (Aziz) had with Laurie before the robbery where Aziz said that Laurie told him that she was pregnant. Eythell told me that they got numerous cookies of cocaine and several thousand dollars from Quintin's house during the robbery. I obtained photographs of Jeremiah Arnold, a black male with a date of birth of April 26, 1971, and Rasheed Abdul Aziz, a black male with a date of birth of October 9, 1974, and showed them to Eythell and he identified Jeremiah as his cousin Jerry and Rasheed Aziz and said that they were the two people with whom he did the robbery of Quintin Evans where they shot and killed all of the occupants of the house.

I learned that a person by the name of Eric Ward had been arrested with Jerry Arnold in 2007 for bank robbery and decided to talk to him to see if Jerry Arnold had ever mentioned this case and to learn more about Jerry Arnold. In June of 2009 I met with Eric Ward and he told me that around 2006 he and Jerry Arnold were sitting around talking and bragging about crimes that they had done and Arnold asked him how he would force a guy who had his girlfriend and a couple of other guys with him to open his safe and give up his drugs and money. Ward said he didn't know and Arnold told him that you kill the two guys and torture the girl so that the guy opens his safe, then you kill the girl and kill the guy. Ward said that Arnold told him that is what he did several years ago and mentioned that the girl was pregnant. Ward said that on another occasion he and Arnold were watching TV and Quanell X came on the news. Ward said that Arnold pointed to Quanell and said 'He ain't shit, it was his people I took care of and he didn't do anything about it.' I know that Quanell X used to go by the name of Quanell Evans. I showed the picture of Jeremiah Arnold to Ward and he said that was the same Jerry he just told me about.

In June of 2009 I spoke to Rasheed Aziz who told me that he knew Quintin Evans back in 1992 and that Evans was a crack cocaine dealer. Aziz said that he was with Quintin and Laurie, Quintin's girlfriend, the night before they were murdered and that Quintin was mad because his keys were missing. Aziz said that Quintin was yelling at both he and Laurie about the missing keys. Aziz said that he later spoke to Laurie on the phone around 2:00 or 3:00 a.m. and that he went by the house just before the sun came up but no one answered the door. Aziz said that there was an open window and the music was loud

and he felt like something was wrong so he told Quintin's mother or brother to call the police. Aziz told me that he could not remember if he went into the house but that he did put his head in the window but didn't see anything. Aziz said he would never forget the way Laurie was shot because she was in bed, with the covers pulled up and her hand covering her face. I asked him how he knew that and he said because the detective showed him photos in 1992. I asked Aziz if he was Quintin's bodyguard and he denied it but said that back in 1992 everyone thought he was. Aziz told me that he believed that the murders were committed by someone Quintin trusted. I asked Aziz if he was Jamaican and he said no, but that he had Jamaican roots and that when he lived in Houston in 1992 he hung around Jamaicans and used a Jamaican accent because he thought it would enhance his image as a drug dealer.

I checked HPD case number 76911792Z and noted that Sergeant Boyd Smith prepared a supplement in which he documented that Sergeant Ronny Doyle of the Houston Police Department spoke to Rasheed Aziz on July 19, 1992, regarding another homicide and Aziz told Doyle that the reason he knew so much about Quintin's murder was because he went inside Quintin's house after the killings and saw the positions of all of the bodies and it was clear how the people died: first it was Jonathan and Rob sleeping on the couches, then Laurie was shot in the bedroom, and then Quintin was shot after he was made to open the safe.

Binford documented in HPD case number 76911792Z that Sergeant Ken Williamson of the Houston Police Department spoke to Rasheed Aziz on July 20, 1992 and Aziz said that he got the information regarding the positions of the bodies in Quintin's house from Quincy Evans and that he never went into the house. Aziz also told Williamson that Quintin trusted him as his bodyguard and that when he was at Quintin's house, Quintin would not carry a gun around.

I spoke to Lieutenant Walker of the Houston Police Department who told me that he spoke to Quincy Evans on August 4, 2009 and Quincy said that he never told Aziz the positions of the bodies in his brother's house and has not spoken to Aziz since before he discovered his brother's body on July 17, 1992. I reviewed a supplement in HPD case number 76911792Z prepared by Sergeant Boyd Smith of the Houston Police Department where he documented that on July 21, 1992 he received an anonymous phone call from a female saying that the person responsible for the murders of Quintin Evans and his brothers was Rasheed Aziz, a Jamaican. The female stated that Rasheed came

> over to her house on July 17, 1992, crying and saying, 'They weren't supposed
> to kill them.'  She said that Rasheed said that he was approached by some
> males who wanted him to help them rob Quintin of his drugs and money.  The
> female said that Rasheed said that  the plan was he was supposed to steal a key
> to the house and then when things were all quiet they would come in and rob
> them of their stuff.  She said that Rasheed said that they got into Quintin's
> house with the keys he provided and the girl was shot with her hands in front
> of her face and then they forced Quintin to open the safe and then killed him.
> The female said that Rasheed said that the people were all shot in the head and
> that they were his friends.

(Docket Entry No. 25, Exhibit 1, pp. 1–3.)  As shown by this testimony, plaintiff clearly is

incorrect in arguing that, without Ward's testimony, defendants would have lacked probable

cause to arrest and charge plaintiff for the murders.  To the contrary, it was Eythell's

testimony that directly implicated plaintiff's involvement in the murders.

After Harris became aware that plaintiff had been in jail at the time of the murders,

Harris and Walker re-interviewed Eythell in prison and confronted him with the new

evidence establishing that plaintiff could not have participated in the murders.  In his

investigation report supplemental narrative, Harris stated as follows:

> Information was received that [plaintiff] was in jail at the time of the murders.
> An off line search showed that he was in jail in Harris County at the time of
> the murders.  This charge was dismissed against him.  This caused myself and
> Lt. Walker to go and re-interview Dwayne Eythell.
> II.  3rd Interview of Eythell
>
> Walker and I went [to] Eythell's prison and interviewed him.  During this
> interview he admitted that he made up the story about [plaintiff] because he
> figured he was going to go down.  He said that [plaintiff] had promised him
> money and support and that he did not even get a visit from him or his family.
>
> Eythell went on to then accuse Lt. Walker and I of showing him photos and
> that is how he was able to confess.  He then was asked one more time about

20

the case and that if he did not do it he did not do it but his character was on the line and as far as we saw him he was a liar.

He lowered his head and then said that he was lying about [plaintiff] because he figured that he was going away forever and why not bring him down. He then apologized for ruining the case. He then was asked directly if he did the killing. He would not answer but said that everything he had said before was true except that [plaintiff] was not involved. I asked him what he meant and he said that he and Aziz did the killing.

He said that Aziz did all the killing and that he was only down for the robber[y] and that he did not kill anyone. He then went on to describe the body positions and in great detail the layout of the apartment. Out of the blue he apologized to Lt. Walker and I and said 'You did not show me any pictures.'

(Docket Entry No. 35, p.13.)

    In his affidavit submitted in support of the motion for summary judgment, defendant

Harris testifies as follows:

My name is Sergeant Brian Harris. I am over twenty-one (21) years of age. I am of sound mind and qualified to make this affidavit. I have never been convicted of a felony or a crime involving moral turpitude. I currently hold the rank of Sergeant with the City of Houston's Houston Police Department ('HDP'). I have been a Police Officer with the City of Houston for approximately 18 years and I have been a certified Texas peace officer for 25 years. I am currently assigned to the Homicide Division, Murder Investigations Unit. I have personal knowledge of the facts stated in this Affidavit.

I have reviewed the Plaintiff's Complaint and/or statements on file in this lawsuit. As a part of my duties with the Murder Investigations Unit, I investigated homicide cases that are assigned to me. I am a certified Texas peace officer, and I was a certified officer at the time of the alleged incident. In December of 2008, I was working for Lt. Walker on a Murder squad when I was assigned the cold case file for the quadruple murders of Robert Arceneaux, Jonathan Duncan, Quinttin [sic] Evans, and Laurie Mitchell, which happened on July 17, 1992.

21

Once I received the file, I began to conduct my investigation of the case and conduct interviews with potential leads. At no time did I coach witnesses or commit perjury during my investigation of this case.

The case file that I received included a detailed letter with information regarding the case from a Mr. Dewayne Ethyell [sic], a Texas Department of Corrections inmate. In his letter, Ethyell [sic] stated he had information on the quadruple homicide. He named all four victims and identified one as being pregnant. The letter also gave details of other crimes he and Jeremiah Arnold committed.

I personally interviewed Eythell. After the interview, I researched the people he mentioned that were with him. One person he mentioned, Rasheed Aziz, was also named as a suspect early in the investigation of the murders in 1992 and had been interviewed then. In his 1992 interview Aziz had mentioned that one of the victims was pregnant. Because of the details in the letter and the subsequent interview, I felt that Mr. Eythell was a reliable witness despite making statements against his own penal interests where he admitted that he took part in the planning and the execution of the murders. He said he was only the wheel man and then actually went into the apartment in what was only supposed to be a robbery. I proceeded with my investigation.

Although Ms. Mitchell was not actually pregnant at the time of her death, the only two people who mentioned Ms. Mitchell's pregnancy were Eythell and Aziz. Aziz denied knowing Eythell or Jeremiah Arnold.

In 2009, I interviewed Jeremiah Arnold while he was in federal custody for [an] unrelated 2007 charge. In this interview he denied any knowledge of the murders and insisted he was in jail in Grambling, Louisiana at the time. Based on Arnold's statement, I called Grambling, but neither the police nor the sheriff's department had any record of him being in jail. I then requested Special Agent Glenn Gregory of the F.B.I, to conduct an off line search for any facility that may have housed Arnold at the time of the murders. I was told by Gregory that according to their information, Arnold was not in jail at the time of the murders.

I also interviewed Eric Ward, Arnold's co-defendant in his federal case. Ward told me that Arnold gave him a scenario and asked him how he would force three guys and a girl to open a safe and give up money. Ward described how

22

Arnold explained that Arnold would kill two of the guys and torture the girl while the third guy opened the safe and later kill the girl and the guy. This description was exactly what was believed to have happened in the quadruple murder case. Later in the interview Ward mentioned that Arnold pointed to a picture of Quannell – X [sic] and told him that 'I took care of his people.' Ward stated that he assumed Arnold was talking about killing one of Quannell – X's [sic] family members.

After receiving this information coupled with the information from the Eythell interview, I was lead to believe that Mr. Arnold was one of the people who committed the quadruple homicide.

Based on my training and experience as a Houston Police Homicide Investigator and now Sergeant for 16 years, I felt Mr. Arnold was one of the suspects in this case because I had a co-defendant's statement. I also had his current co-defendant, Eric Ward, who revealed details of a crime that only someone with intimate knowledge of the event would know and Eric Ward was told this information in 2006 to 2007 just a few weeks before he and Arnold committed their current crime. There were many details in what Eythell, Aziz, and Ward told me that were consistent, leading me to believe that they were telling the truth.

At no time did I have reason to believe or did believe Mr. Arnold was in the custody of Harris County at the time of the murders because I had requested a nation wide search to see if he was in custody at the time, and because Arnold insisted that he was in Grambling. After learning he was in custody at the time of the murders the charge against him was dropped on 09-11-2009. When I notified the family that Arnold was in the Harris County jail at the time of the murders just a couple days after being charged, they too insisted that Arnold was not in Texas at the time of the 1992 murders, but that he was in Louisiana. I told the family that I would see to it that the charge would be dropped because Arnold was in custody and could not have participated in the 1992 murders.

In this incident there was clearly reasonable suspicion to investigate Plaintiff Arnold and probable cause to request an arrest warrant because of the information to be given to me by Judge Eric Hagstatte a Harris County Criminal law hearing officer. Neither Eythell, Aziz, nor Ward received any special treatment for speaking to me. At no time during this incident did I lie under oath to ascertain [sic] an arrest warrant. At no time during this incident

did I coach witnesses to obtain false information to intentionally falsely accuse Mr. Arnold of murder.

Throughout this incident I acted as a reasonable and prudent police officer and I conducted my investigation according to the training, practice and policy of the Houston Police Department.

Based on my training as a police officer, my experience, and my observations at the time of this alleged incident, it is my opinion that I was justified in the actions I took.

At no time during this incident did I act with malice, ill will or with a wanton indifference or with deliberate disregard for Plaintiff Arnold's statutory and/or constitutional rights.

At no time during this incident did I violate Plaintiff Arnold's statutory or constitutional rights. Arnold was already in federal Custody.

At no time during this incident did I intentionally inflict emotional distress, verbally or physically abuse Plaintiff Arnold or (informants) or violate Plaintiff Arnolds'[s] Fourth and/or Eighth Amendments to the Constitution of the United States.

I did not commit any improper and/or unconstitutional act during the incident made the basis of this lawsuit, and no reasonable police officer under the circumstances made the basis of this suit could have believed that my actions were unconstitutional, improper, unreasonable, excessive, or done with ill will, indifference and/or wanton disregard for Plaintiff's constitutional and/or statutory rights.

Based on my training, experience, and education, I am familiar with the practices and policies of the Houston Police Department ('HPD') as they relate to Plaintiff's allegations.

HPD does not have any policy, practice or custom which allows its police officers to use perjured testimony or lie under oath.

Likewise HPD does not have any policy, practice or custom which allows its police officers to violate a citizen or suspect's constitutional rights or act with

ill will, malice or deliberate indifference when coming into contact with citizens and/or suspects. These claims are likewise investigated.

All allegations of material facts contained herein are true and correct and are within my personal knowledge.

(Docket Entry No. 25, Exhibit 3, pp. 1–5.)

Lieutenant Ronald Walker of the Houston Police Department submitted an affidavit in support of the motion for summary judgment, in which he testifies as follows:

I currently hold the rank of Lieutenant with the City of Houston's Houston Police Department ('HPD'). I have been a Police Officer with the City of Houston for approximately 27 years and I have been a certified Texas Peace Officer for 27 years. I am currently assigned to the Identification Division, Crime Scene Unit; however, at the time of this incident, I was assigned to the Homicide Division, and I was in charge of the Murder Investigations Unit. I have personal knowledge of the facts stated in this Affidavit.

I have reviewed the Plaintiff's Complaint and/or statements on file in this lawsuit. As a part of my duties with the Murder Investigations Unit, I supervise the investigation of homicide cases that are assigned to my unit. I am a certified Texas peace officer, and I was a certified officer at the time of the alleged incident.

In December of 2008, I assigned the cold case file for the quadruple murders of Robert Arceneaux, Jonathan Duncan, Quinttin [sic] Evans, and Laurie Mitchell which happened on July 17, 1992 to Sergeant Brian Harris.

Based on my training as a police officer, my experience, and my observations of Sergeant Harris' actions during this alleged incident, it is my opinion that Sergeant Harris was justified in the actions he took.

HPD policy and training allows police investigators to question and investigate leads once received, as Sergeant Harris did here. It is the officer's discretion whether they believe a suspect can be named and whether there is probable cause to believe an arrest warrant should be sought.

Based on the information Sergeant Harris received from the two informants it is not unreasonable to believe that Plaintiff Arnold was a suspect to the murders and therefore Sergeant Harris was justified in his actions to bring forward the information to have charges brought against the Plaintiff.  It is my belief that Plaintiff Arnold's rights were not violated under the Fourth and/or Eighth Amendments to the Constitution of the United States.

I also believe Sergeant Harris did not commit any improper and/or unconstitutional act during the incident that made the basis of this lawsuit, and he acted as a reasonable police officer would under the circumstances. Sergeant Harris' actions were not unconstitutional, improper, unreasonable, excessive, or done with ill will, indifference and/or wanton disregard for Plaintiff's constitutional and/or statutory rights.

Based on my training, experience, and education, I am familiar with the practices and policies of the Houston Police Department ('HPD') as they relate to Plaintiff's allegations.

HPD does not have any policy, practice or custom which allows its police officers to use perjured testimony or lie under oath.

Likewise HPD does not have any policy, practice or custom which allows its police officers to violate a citizen or suspect's constitutional rights or act with ill will, malice or deliberate indifference when coming into contact with citizens and/or suspects. These claims are likewise investigated.

All allegations of material facts contained herein are true and correct and are within my personal knowledge.

(Docket Entry No. 25, Exhibit 4, pp. 1–3.)

The record and probative summary judgment evidence establish that probable cause existed for the arrest warrant and criminal charges, primarily in light of Eythell's statements directly implicating plaintiff.  Plaintiff does not claim, and the record does not show, that Harris "coached" Eythell to testify falsely as to plaintiff's involvement, nor does plaintiff show that Harris or any other defendant was aware of the falsity of Eythell's testimony at the

time the warrants and charges were obtained.  Further, plaintiff presents no probative summary judgment evidence of what Ward actually knew or did not know at the times he was interviewed by defendants.  Plaintiff's conclusory and hearsay factual allegations that Ward could not have known any relevant facts absent "coaching" does not constitute probative summary judgment evidence of Ward's actual knowledge at the time.

Moreover, the uncontroverted probative summary judgment evidence shows that, when asked to establish his whereabouts for the time of the murders, plaintiff and his family stated that he had been in custody in Louisiana.  Although Harris requested defendant Gregory to search, no records could be found verifying plaintiff's statement.  Much later, Harris discovered that plaintiff had been in a local jail, not in a Louisiana facility, at the time of the murders.  Although Harris and other defendants had attempted to locate plaintiff in jail, their initial efforts were unsuccessful, and plaintiff presents no probative summary judgment evidence to the contrary.

Defendant Harris is entitled to summary judgment dismissal of plaintiff's individual capacity claims against him.

### Eighth Amendment Claim

Plaintiff complains that, as a result of the publicity surrounding his charges for the murder of Quanell X's brother, other prison inmates attempted to cause him bodily harm on April 18, 2010.  The attempted assault ceased when he produced documents showing that he had been in prison at the time of the murders.  (Docket Entry No. 32, p. 34.)  Plaintiff further

27

alleges that his life and safety were in jeopardy in prison due to the false charges, and that he was housed in protective custody and/or administrative segregation for nearly a year for his own safety.

It is unclear from the pleadings whether plaintiff raised these allegations as a separate section 1983 claim, or as proof of injury for purposes of establishing damages. To the extent plaintiff is attempting to raise an Eighth Amendment claim regarding his conditions of confinement in federal prison, the City of Houston and Harris are not proper defendants for such claim, as plaintiff was in federal custody. It was the duty of federal prison officials to protect plaintiff from harm caused by other inmates while he was in federal custody. Regardless, plaintiff neither alleges nor presents probative summary judgment evidence that he suffered any physical injury resulting from an Eighth Amendment violation while in federal custody, as required under 42 U.S.C. § 1997e(e) for purposes of compensatory damages.[7]

For these reasons, any independent Eighth Amendment claim raised by plaintiff in this lawsuit against the named defendants is dismissed for failure to state a viable claim under section 1983.

---

[7]Plaintiff submitted an affidavit of a fellow inmate who testified that he "stopped other inmates from causeing [sic] bodily harm to" plaintiff due to the criminal charge for murdering Quanell X's brother. (Docket Entry No. 32, p. 34.) No actual physical injury is shown.

28

### *Defendants Ryza and Gregory*

Plaintiff named as additional defendants in his complaint police officer David A. Ryza and federal agent Glenn Gregory.  These individuals were not served with process, and are subject to dismissal by the Court pursuant to section 1915A.

Because plaintiff was incarcerated at the time he filed this lawsuit, his complaint is governed by the Prison Litigation Reform Act ("PLRA").  Under the PLRA, the district court is to screen a prisoner's complaint and scrutinize the claims.  It must dismiss the complaint, in whole or in part, if it determines that the complaint is frivolous, malicious, or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b).

Although a *pro se* litigant's pleadings are to be construed liberally, *Howard v. King*, 707 F.2d 215, 220 (5th Cir.1983), *pro se* litigants are not exempt from compliance with the relevant rules of procedure and substantive law.  *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981).

In reviewing the complaint, this Court takes the factual allegations of the complaint as true, and draw all reasonable inferences, and resolve ambiguities, in the plaintiff's favor. *See Lormand v. U.S. Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009).  However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009); *see also Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).  Bare

recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice to either obtain, or prevent, dismissal for failure to state a claim. *Bell Atlantic Corp. v. Twombly*, 550, U.S. 544, 555 (2007).

Under *Iqbal—Twombly*'s two-pronged approach, the Court must determine whether the complaint, as augmented by the more definite statement, contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 555. The first step for the Court is to determine those pleadings that are more than just "mere conclusions" and thus are entitled to the presumption of truth. *Iqbal*, 129 S. Ct. at 1949–50. Then, assuming the veracity of these facts, the Court must determine whether the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and "plausibly give[s] rise to an entitlement to relief." *Id*.; *see also Rhodes v. Prince*, 360 F. App'x 555, 557 (5th Cir. 2010). If the pleadings fail to meet the requirements of *Iqbal* and *Twombly*, no viable claim is stated and the pleading is subject to dismissal. The same standards for review of a motion to dismiss under Rule 12(b)(6) apply to a court's *sua sponte* dismissal under section 1915A. *Hart v. Hairston*, 343 F.3d 762, 763–64 (5th Cir. 2003).

Section 1983 provides a remedy to a party who, as the result of state action, suffers a derivation of his rights, privileges, or immunities secured by the Constitution or the laws of the United States. *White v. Thomas*, 660 F.2d 680, 683 (5th Cir. 1981). Thus, to state a claim under the statute, a plaintiff must prove (1) a violation of the United States Constitution

or federal law; and (2) that the violation was committed by one acting under color of state law. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 251–53 (5th Cir. 2005).

A plaintiff alleging a section 1983 cause of action against government officials in their individual capacities must make specific factual allegations that support each individual's role in the constitutional deprivation at issue. *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). To state a section 1983 claim, a plaintiff must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation. *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999).

Plaintiff raises individual capacity claims against Ryza and Gregory. In his more definite statement, plaintiff alleges that Gregory was present when Harris coached Ward, and that Gregory had access to public records that would have shown plaintiff had been in custody at the time of the murders. He further alleges that Ryza was part of the conspiracy comprised of Harris, Gregory, and Ryza, which had as its goal the indictment of plaintiff for murder.

By stating that Gregory was "present" during Harris's alleged "coaching" of Ward, plaintiff fails to set forth facts sufficient to raise a section 1983 claim against Gregory. Gregory's presence at the interrogation, without more, does not establish any colorable civil rights claim against Gregory. Regardless, the Court has already determined that plaintiff presents no probative summary judgment evidence that Harris "coached" or coerced Ward

to fabricate plaintiff's involvement in the murders; again, Gregory's presence at the interview violated no alleged constitutional right or federal protection. Nor does plaintiff allege facts sufficient to raise a section 1983 claim in setting forth his belief that Gregory had "access" to public records that would have shown that plaintiff was incarcerated at the time of the murders. Plaintiff does not allege that Gregory knew plaintiff had been incarcerated at the time or that Gregory failed to investigate whether he had been incarcerated. It bears repeating that probative summary judgment evidence establishes that plaintiff and his family had mislead defendants by stating plaintiff had been in custody in Louisiana at the time. At most, plaintiff alleges that Gregory did not do a good job checking the records because, if he had, he arguably would have located plaintiff. Gregory's failure to locate plaintiff's place of incarceration, without more, does not give rise to a viable claim under section 1983.

Moreover, plaintiff fails to allege facts sufficient to give rise to a claim that Harris, Gregory, and Ryza conspired to indict plaintiff for the murders. To state a claim for conspiracy under section 1983, a plaintiff must allege the existence of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation. *Cinel v. Cannock*, 15 F.3d 1338, 1343 (5th Cir. 1994). To that end, plaintiff is required to plead enough facts to state a claim for relief that is plausible on its face. *Twombly*, 127 S. Ct. at 1974. General conclusory charges of conspiracy with no specific allegation of facts tending to show a prior agreement cannot survive a motion to dismiss. The complaint must include specific factual

32

allegations showing a prior agreement, plan or meeting of the minds between or among the defendants. The bare assertion of a conspiracy will not suffice. *Id.* at 1966.

Plaintiff sets forth no specific factual allegations showing a prior agreement, plan, or meeting of the minds between or among these defendants, and his bare assertion of the existence of a conspiracy is insufficient to state a claim for relief that is plausible on its face. Moreover, the Court has already determined that there was probable cause for an arrest warrant and/or criminal charges against plaintiff, based on Eythell's statements to the police. That Eythell later confessed to lying about plaintiff's involvement in the murders did not deprive defendants os probable cause prior to that point in time. Because plaintiff presents no summary judgment evidence of a wrongful or unconstitutional act, he cannot establish that the defendants conspired to accomplish a wrongful or unconstitutional act.

Plaintiff fails to state a plausible section 1983 claim against Ryza or Gregory, and they are DISMISSED from this lawsuit pursuant to section 1915A.

### *Injunctive Relief*

Plaintiff seeks an injunction ordering the defendants to publicly announce his innocence. Because plaintiff has failed to demonstrate the deprivation of a constitutional right, particularly one that is ongoing or likely to occur, he is not entitled to injunctive relief under section 1983. *See Green v. Mansour*, 474 U.S. 64, 68 (1985); *Ganther v. Ingle*, 75 F.3d 207, 209 (5th Cir. 1996).

### *State Law Claims*

Because the Court has concluded that all of the federal claims asserted in this action are subject to dismissal, the Court declines to exercise supplemental jurisdiction over any state law claim that plaintiff may be attempting to assert.  See 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction over a claim if the court has dismissed all claims over which it has original jurisdiction). Accordingly, plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE to being pursued in state court.

### *Motion for Contempt and Sanctions*

On October 5, 2011, the Court ordered defendants to produce for plaintiff certain discovery documents as set out in the order.  (Docket Entry No. 30.)  The document production was expressly subject to a protective order set out in the Court's order, which prohibited plaintiff from disclosing any of the documents or information in the documents to any third parties or entities.  *Id*.  Pursuant to the production and protective orders, defendants tendered discovery documents to plaintiff.

Defendants subsequently filed a motion for contempt and sanctions against plaintiff, asserting that plaintiff had violated the protective order.  (Docket Entry No. 41.)  In support, defendants attached to their motion an entry on the website, "Concerned Citizens for Racial Equality," dated May 4, 2012, which defendants contend inaccurately publicized information

34

that was released to plaintiff under to the protective order.[8]  According to defendants, the website entry referenced specific language and confidential information that had been provided to plaintiff through discovery and that had not been released to the public or filed in any other court documents.  Defendants argue that the information can be traced solely to the confidential documents produced to plaintiff under the protective order.

The specific URL address to which defendants direct the Court leads to a web page that states, "Sorry, the page you were looking for in this blog does not exist."  Apparently, the offending website page has been removed by third parties.  However, the Court notes that the web blog entry remains available through the web page link, "Subscribe to: Posts (Atom)," and under the May 2012 Blog Archive.  The Court has reviewed the May 4, 2012, blog entry and finds that it directly quotes from the transcripts of the interviews that were provided to plaintiff through discovery in this lawsuit and under the protective order.

While this fact alone may suggest that plaintiff violated the protective order, the Court also notes that plaintiff attached copies of the transcript excerpts to his response to the motion for summary judgment, which was filed on *November 7, 2011*.  (Docket Entry No, 35.)  Thus, defendants cannot show, and the Court cannot find, that third parties did not obtain this information through public access to the Court's docketing system.  Plaintiff did not file his response under seal, and the protective order did not require him to file any use of or reference to the confidential documents under seal.

_____

[8]http://concernedcitizensforracialequality.blogspot.com/2012/05/corruption-lies-and-misconduct-in.html.  Last visited August 23, 2012.

Accordingly, the motion for contempt and sanctions (Docket Entry No. 41) is DENIED.

Nevertheless, by its own terms, the protective order requires plaintiff to return all originals and copies of the documents he received from defendants under the production order. (Docket Entry No. 30.)  Specifically, plaintiff is under orders to return the documents to the Office of the City Attorney, City of Houston, Legal Department, Labor, Employment, and Civil Rights Section, or to the attorney of record for the defendant City of Houston, within thirty days after final disposition of this lawsuit.

Because this memorandum and order constitutes a final disposition of this lawsuit, plaintiff is ORDERED to return all originals and copies of the documents he received from defendants, and to return them to the Office of the City Attorney, City of Houston, Legal Department, Labor, Employment, and Civil Rights Section, or the attorney of record  for the defendant  City of Houston, within thirty days from date of this order.  Plaintiff's failure to comply timely and fully with this order may result in the imposition of monetary or other sanctions against him upon motion by defendants.

*Conclusion*

The Court ORDERS as follows:

1.    Defendants' motion for summary judgment (Docket Entry No. 25) is GRANTED.

2.    Plaintiff's federal claims against the defendants are DISMISSED WITH PREJUDICE.

3.    Plaintiff's state law claims against the defendants are DISMISSED WITHOUT PREJUDICE.

4.    Defendants' motion for contempt and sanctions (Docket Entry No. 41) is DENIED.

5.    Plaintiff is ORDERED to return all originals and copies of the documents he received from defendants, and to return them to the Office of the City Attorney, City of Houston, Legal Department, Labor, Employment, and Civil Rights Section, or to the attorney of record for the defendant City of Houston, within thirty days from date of this order.

6.    Any and all pending motions are DENIED AS MOOT.

Signed at Houston, Texas on August 31, 2012.

_____
Gray H. Miller
United States District Judge